## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | Case No. 22-cr-258-BAH |
| DANIEL JAHLEEL THOMAS | * | |
| | * | |
| Defendant. | * | |

### REPLY IN SUPPORT OF MOTION TO WITHDRAW GUILTY PLEA

The Defendant, Daniel Jahleel Thomas, by and through counsel, Michael E. Lawlor, Adam C. Demetriou, and Brennan, McKenna & Lawlor, Chtd., respectfully submits the following Reply in Support of his Motion to Withdraw Guilty Plea. Mr. Thomas incorporates and reasserts the argument raised in his original Motion. (ECF No. 67.)

## ARGUMENT

### I.   Mr. Thomas' Assertion of a Legally Cognizable Defense Meets the Requirement of the Binding Precent of the D.C. Circuit

In its response in opposition to Mr. Thomas' Motion to Withdraw Guilty Plea, the Government argues that Mr. Thomas cannot prevail because he has not asserted that he is actually innocent of the charges against him. The Government's argument ignores binding precent, which recognizes that the assertion of a legally cognizable defense is sufficient under the withdrawal standard. The chief case the Government cites for its mistaken proposition is *United States v. Curry*, 494 F.3d 1124 (D.C. Cir.

1

2007). The Government argues that the D.C. Circuit's precedent "draws a *bright line* between 'the defendant had a legitimate defense' and 'the defendant asserted his innocence.'" (Gov. Opp., ECF No. 70 at 28 (emphasis added) (citing *Curry*, 494 F.3d at 1128-29).) But that is not the case. Mere paragraphs after the passage cited by the Government, the *Curry* court acknowledged that the precedent establishes no such bright line: "It is true that some of our cases have characterized this first factor as requiring a 'legally cognizable defense' rather than as requiring a viable claim of innocence . . . and that many have used the terms interchangeably." *Curry*, 494 F.3d at 1129 (cleaned up) (citing *United States v. Shah,* 453 F.3d 520, 522 (D.C. Cir. 2006); *United States v. McCoy,* 215 F.3d 102, 106 (D.C. Cir. 2000); *United States v. Cray,* 47 F.3d 1203, 1207-09 (D.C. Cir. 1995); *United States v. Ford,* 993 F.2d 249, 251 (D.C.Cir.1993)). As *Curry* makes clear, contrary to the Government's argument, the D.C. Circuit recognizes that in certain circumstances, the assertion of a legally cognizable defense is sufficient to meet the first prong of the withdrawal standard.

In *Curry*, the defendant argued that he had demonstrated a legally cognizable defense to the charges against him because: (1) there was no evidence of controlled buys from him; (2) he did not own the car in which the Government alleged that narcotics were transported; (3) other people had access to the apartment in which contraband was recovered: and, therefore (4), the Government would not be able to meet its burden of proving his guilt beyond a reasonable doubt. *Curry*, 494 F.3d at

1128. The *Curry* court did not hold that putting the Government to its proof can never constitute a legally cognizable defense under the line of binding cases cited above. Instead, the Court determined that that "[putting the Government to its proof] *in this case* had a very limited chance of success" in light of the other evidence that would have been adduced at a trial against the defendant, including the testimony of an informant, videotape of controlled transactions among individuals associated with the defendant, and the defendant's post-arrest statements. *Id.* at 1129-30 (emphasis added).

The circumstances here could not be more different from those at issue in *Curry*. In this case, all of the Government's evidence flows from the unconstitutional warrantless arrest of Mr. Thomas, whereby he was dragged out of the backseat of a car that was parked on the side of a residential street by officers who had not observed him engage in any activity that was even arguably criminal. Were this evidence to be properly suppressed, the Government would simply not be able *even to attempt* to meet its burden to prove each and every element of each offense. There would be no trial. Indeed, in its Opposition, the Government does not challenge Mr. Thomas' argument that "[i]f the Court were to suppress the fruits of the illegal search and seizure, that ruling would be dispositive as to the charges in the Indictment: there is simply no way the Government could prove its case without the illegally obtained evidence." (Def. Mot., ECF No. 67 at 11.) By its silence, the Government concedes

3

the point. Under binding precedent, Mr. Thomas has legitimately asserted a legally cognizable defense against the charges in this case.

## II.   Mr. Thomas' Guilty Plea Was Tainted by Ineffective Assistance of Counsel

The Government argues that Mr. Thomas cannot demonstrate that his guilty plea was tainted by ineffective assistance of counsel because: (1) when officers, who had not observed Mr. Thomas engage in any conduct even suggesting criminal activity, opened the closed rear passenger door of a stopped car, forcibly removed Mr. Thomas, and placed him under arrest in order to question him about a homicide investigation, they were actually effectuating a legitimate *Terry* stop founded upon reasonable suspicions that only became apparent later in an attempt to rationalize the encounter; (2) in the context of coercive plea negotiation tactics on the part of the Government, prior counsel made a legitimate strategic decision to forego a meritorious motion to suppress the fruits of that arrest in contravention of Mr. Thomas' wishes; and (3) even if prior counsel had performed deficiently, Mr. Thomas did not suffer prejudice because, contrary to the evidence before the Court, Mr. Thomas would not have elected to proceed to trial. The Government's argument is untenable.

The Government's own recitation of the officers' actions on February 25, 2022 shows that Mr. Thomas was not the subject of a legitimate *Terry* stop but that he was

4

instead arrested, without the support of a warrant or other indicia probable cause, using highly intrusive means. Contrary to the Government's assertion, Mr. Thomas recognizes what has been black-letter law for decades: "Under the Fourth Amendment, a police officer may effect a brief seizure for investigative purposes— a *Terry* stop—if he has a reasonable suspicion, grounded in specific and articulable facts, that a person . . . was involved in or is wanted in connection with a completed felony." *United States v. Abdus-Price*, 518 F.3d 926, 929 (D.C. Cir. 2008) (citations omitted). However, even if an officer has reasonable, articulable suspicion that a person is involved in or wanted in connection with a completed felony sufficient to satisfy the *Terry* standard (which the officers in this case did not), there are constitutional limits on the means that can be used to effectuate a *Terry* stop before the stop becomes an arrest. An officer conducting a *Terry* stop must "employ 'the least intrusive means reasonably available to verify or dispel the officer's suspicion.'" *United States v. Smith*, 373 F. Supp. 3d 223, 238 (D.D.C. 2019) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). "For purposes of the Fourth Amendment, a stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall v. D.C.*, 867 F.3d 138, 153 (D.C. Cir. 2017).

The Government points to the following factors in support of its argument that the three officers had reasonable articulable suspicion that Mr. Thomas was engaged

in criminal conduct on February 25, 2022: (1) On November 25, 2020 Mr. Thomas had been ordered by the Superior Court for the District of Columbia in case number 2020-CF2-8970[1] to stay away from 4371 Benning Road – a location where officers *did not observe him* on February 25, 2022; (2) from the date of Mr. Thomas' prior arrest in November 2020 through February 25, 2022, Mr. Thomas made "numerous" Instagram posts on various undisclosed dates showing him in possession of firearms and controlled substances – yet within that timeframe, neither Superior Court Pretrial Services nor the United States Attorney's Office ever sought or obtained revocation of Mr. Thomas' conditions of release in the 2020 case; (3) Mr. Thomas was wanted *for questioning* by MPD in relation to a homicide – yet, as explained in the Motion, the WALES lookout text explicitly stated that the lookout was not to be used as a basis to effectuate an arrest; (4) on the day of the February 2022 arrest, law enforcement interpreted posts on an Instagram account believed to be associated with Mr. Thomas as advertising the sale of marijuana in the Ft. Chaplin area; (5) Mr. Thomas, like many young African-American men throughout the District of Columbia, happened to be located in a high crime area mere feet away from *where he resided with the permission of Superior Court Pretrial Services*; and (6) Mr. Thomas, who again, like many African-American men in the District of Columbia,

---

[1] On July 19, 2023, that case was dismissed upon Government motion.

has been harassed by police throughout the years, walked to his rideshare vehicle, entered the rear passenger side, and closed the door, after officers drove past him.

None of these factors gives rise to reasonable articulable suspicion that Mr. Thomas, who was innocently standing alone on the sidewalk of a residential street before entering his rideshare vehicle, was involved in criminal activity at the time of the seizure. Again, officers did not observe Mr. Thomas with a firearm at the time they decided to get out of their vehicles, run to the car where Mr. Thomas was seated, open a closed door, and drag Mr. Thomas out. They observed no hand-to-hand transactions: Mr. Thomas was alone on the street. Mr. Thomas had not engaged in a motor vehicle violation: he wasn't driving, and the rideshare vehicle was stopped. There was no tip indicating that a person fitting Mr. Thomas' description was involved in criminal activity.

Moreover, the Government now claims that it was Officer Serratos, one of the three officers who arrested Mr. Thomas, who on February 25, viewed purported marijuana advertisements on an Instagram account believed to be associated with Mr. Thomas. (Gov. Opp., ECF No. 70 at 37.) However, neither of the reports memorializing the arrest contains this information. Officer Bartley's report dated March 2, 2022 references Officer Serratos by name in relation to several actions she

undertook to arrest Mr. Thomas. *See* Ex. A[2] ("Officer Serratos observed;" "Officer Serratos immediately performed;" "Officer Serratos then felt;" "Officer Serratos then visually confirmed"). The Gerstein affidavit sworn out by Officer Shoemaker on February 25, 2022 similarly described actions personally performed by Officer Serratos and referenced her by name. *See* ECF No. 67-1 ("Officer Serratos observed;" "Officer Serratos immediately performed;" "Officer Serratos then felt"). As to any observation of marijuana-related postings on Instagram, both documents merely state that officers had knowledge that "on today's date, Defendant Thomas had advertised that he was selling marijuana in the Ft. Chaplin Apartment Complex." Ex. A; ECF No. 67-1. If, as the Government claims, Officer Serratos personally viewed those postings "and notified Officers Bartley and Shoemaker," it makes no sense that those officers would not have included that detail in their reports. (ECF No. 70 at 37.)

Additionally, in the March 8, 2022 affidavit in support of a warrant to search a phone seized during the arrest of Mr. Thomas, the affiant, FBI Special Agent Joshua Rothman notes only that at the time officers observed Mr. Thomas innocently standing on the sidewalk and then getting into his rideshare vehicle, those officers had knowledge that Mr. Thomas "had advertised marijuana for sale on the Instagram

---

[2] Curiously, the arrest report author is listed as "Sirena Serratos," yet the reporting officer signature contains Officer Bartley's name.

social media platform," but not that officers had viewed postings from that date or that it was Officer Serratos, one of the arresting officers, who made the observations and then communicated them to the other two officers. *See* Ex. B at 7-8. As in the reports discussed above, Agent Rothman makes reference to several specific actions Officer Serratos undertook to effectuate the arrest of Mr. Thomas. *Id.* at 10 ("Officer Serratos observed;" "Officer Serratos felt"). But there is no indication that it was she who personally observed the supposed Instagram posts and then communicated that information to the other arresting officer. The Government's claim in this regard is simply not credible. But even if it were, it does not constitute reasonable suspicion that Mr. Thomas was involved in criminal activity while he stood alone on the sidewalk and then entered a vehicle.

It is likewise not credible that various unknown, unnamed MPD officers had observed Mr. Thomas with firearms and narcotics on various unspecified occasions between his arrest in November 2020 and his arrest in February 2022. If that were the case, the Government would have sought revocation of Mr. Thomas' Superior Court release conditions. But that never happened. And there is no indication that any officer had reason to believe Mr. Thomas possessed a firearm at the time they saw him on Benning Road.

Even if the innocuous and otherwise incredible facts and circumstances described above amounted to reasonable, articulable suspicion sufficient to support

a *Terry* stop, the highly intrusive means used by the officers rendered the encounter an arrest. "In examining the reasonableness of the force used in making a stop, courts have considered such factors as the time of day, the 'high crime' nature of the area, a tip that the suspect may be armed, furtive hand movements, flight or attempted flight, a pressing need for immediate action, and the involvement of drugs." *United States v. Devaugh*, 422 F. Supp. 3d 104, 114 (D.D.C. 2019) (citing *United States v. Clark*, 24 F.3d 299, 302 (D.C. Cir. 1994)). Courts also consider the degree of force, including whether handcuffs, "a hallmark of a formal arrest," are used. *Devaugh*, 422 F. Supp. 3d at 114. Courts further consider the number of officers participating in the show of force. *Id.* Here, the methods used by the officers were indeed highly intrusive. First, the encounter occurred in broad daylight. Officers had received no tip that Mr. Thomas was armed and dangerous. Mr. Thomas did not flee from officers – he calmly walked to his rideshare vehicle, entered the car, and closed the door, all before the officers even got out of their cruiser to attempt to arrest him. As he stood on the sidewalk and walked to the vehicle, Mr. Thomas made no furtive movements towards his groin area. And officers had not seen Mr. Thomas engage in any conduct that suggested the involvement of drugs.

But here is what did happen: officers approached the stopped vehicle, opened the closed rear passenger door, grabbed Mr. Thomas, and dragged him out. This display of force is clear evidence of an arrest. *Three officers* descended on the vehicle

and participated in grabbing Mr. Thomas and dragging him out to the street. Mr. Thomas was immediately restrained and handcuffed. In its 55-page opposition to Mr. Thomas' Motion, the Government does not cite a single case standing for the proposition that officers may, without probable cause, open the closed door of a vehicle, grab a man, and drag him out all in the course of a legitimate *Terry* stop. The warrantless arrest of Mr. Thomas occurred in violation of his Fourth Amendment right to be free from unreasonable searches and seizure. Under the exclusionary rule and the fruit of the poisonous tree doctrine, all evidence derived from this unconstitutional encounter is subject to suppression. An attorney performing his duties in a reasonable manner would have filed a motion as to this critical issue.

Notwithstanding the meritorious and dispositive suppression issue in this case, the Government claims that prior counsel performed reasonably when, in response to coercive plea negotiation tactics on the part of the Government, prior counsel failed to file and litigate a motion to suppress. The Government notes that "at all times during the plea negotiations, [Government] counsel made it clear to [prior counsel] that the filing of substantive motions – such as a motion to suppress evidence would result in the termination of plea negotiations until those motions were resolved." (ECF No. 70 at 48 n.4.) The Government also represents that it dangled before prior counsel the prospect that if the Government were to prevail at

a motions hearing, there would be a "very real possibility that the United States' plea offer would become substantially less generous given the reduction in their litigation risk at trial." (*Id.* at 48.)

As noted in the Motion to Withdraw, on January 14, 2023, the Court set a deadline for the filing of pretrial motions of March 3, 2023. The docket reflects that no motions were filed on Mr. Thomas' behalf. In a letter to the Court dated March 13, 2023, Mr. Thomas expressed his dissatisfaction with not having had sufficient opportunity to review the discovery with prior counsel and with the fact that he felt he was "fighting [his] case alone." (ECF No. 35.) After prior counsel was permitted to withdraw, Mr. Thomas again wrote to the Court and expressed concerns about the advice he had received regarding the filing of motions. (ECF No. 50.) As the record reflects and as he would testify to at a hearing, Mr. Thomas wished for prior counsel to file pretrial motions, including a motion to suppress the fruits of the February 2022 arrest. Prior counsel failed to do so even though such a motion would have had substantial merit. The American Bar Association has issued standards for the conduct of criminal defense attorneys. These standards have been cited by Supreme Court in cases evaluating claims of ineffective assistance of counsel. *E.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010). The ABA Standards for the Defense Function list several decisions in a case that are reserved for a client to make. Among those is the decision of whether to accept a plea offer or proceed to trial. ABA Standards for

Criminal Justice, Defense Function 4–5.2(b) (4th ed. 2017). And while decisions about the crafting of motions are ordinarily left to counsel, such decisions must be made in the context of a reasonable strategy to secure a favorable outcome for a client and after careful consultation with a client.

Here, trial counsel failed to file a motion to suppress that likely would have resulted the dismissal of the charges against Mr. Thomas. Certainly, if such a motion had been filed and granted, evidence of the firearm would not have been admissible at any potential trial, thereby removing the prospect of a 30-year mandatory minimum sentence. The cases the Government cites for the proposition that the failure to file a motion to suppress in this case did not constitute ineffectiveness are inapposite. In *Premo v. Moore*, 562 U.S. 115 (2011), the Supreme Court upheld a lower court determination that trial counsel performed reasonably when he encouraged the petitioner to accept a plea offer and failed to move to suppress the petitioner's confession to law enforcement. In that case, however, the petitioner had made admissible confessions to two other witnesses. In Mr. Thomas' case, the physical evidence seized would not have been admissible in any other form had the fruits of the search been suppressed. In *Curry*, 494 F.3d at 1130, trial counsel actually filed and began to litigate a motion to suppress. During an overnight recess from the suppression hearing, the appellant made the decision to plead guilty. *United States v. Wood*, 879 F.2d 927 (D.C. Cir. 1989), involved the failure of trial counsel to file

or join in a motion to suppress a search conducted pursuant to a warrant. But here, officers dragged Mr. Thomas out of a vehicle and arrested him without a warrant.

As noted in the Motion to Withdraw, courts have not hesitated to find ineffective assistance of counsel based upon the failure to file and litigate meritorious pretrial motions. This case presents a dispositive suppression issue. An attorney performing reasonably in prior counsel's place would have filed such a motion.

Finally, Mr. Thomas indeed suffered prejudice based on prior counsel's failure to file and litigate a motion to suppress. At a hearing, Mr. Thomas would testify that had prior counsel properly advised him on the merits of the suppression issue and filed a motion to suppress, he would not have pled guilty. And that assertion is credible: the granting of the motion would have significantly weakened, if not dismantled, the Government's case.

## III.   The Government Concedes that It Has Suffered No Prejudice in Its Ability to Try this Case, and Its Other Prejudice Arguments Are Baseless

The Government has conceded that it has not suffered prejudice to its ability to try this case should this Court grant Mr. Thomas' Motion. (ECF No. 70 at 52.) That should end the discussion on this factor. Unfortunately, the Government has included in its response baseless speculation about ulterior motives for continuance requests on the part of defense counsel. That speculation is easily debunked. The

14

undersigned counsel accepted a CJA appointment to represent Mr. Thomas after prior counsel filed a motion to withdraw. The undersigned counsel appeared for a hearing on April 21, 2023. Mr. Thomas was not transported from Warsaw, Virgina. The undersigned counsel again appeared for a status conference on April 25, 2023.

On June 8, 2023, the undersigned counsel filed a motion to extend the deadline to inform the Court about Mr. Thomas' decision on whether to move to withdraw his guilty plea. (ECF No. 52.) The reason for that motion is that the undersigned counsel needed time to review the discovery, conduct legal research, and meet with Mr. Thomas (who is housed several hours from undersigned counsel's office in Greenbelt). Additionally, the undersigned counsel were engaged in intensive preparation for trailing jury trials in two sex abuse cases in the Circuit Court for Montgomery County, Maryland. As in this case, in those cases, the undersigned counsel were appointed to represent an indigent client. Both jury trials resulted in acquittals.

On July 10, 2023, the undersigned counsel filed a further motion to continue the deadline for notifying the Court about Mr. Thomas' decision. The basis for that request was that lead counsel for Mr. Thomas had been hospitalized in late June and required additional time to meet with Mr. Thomas to discuss this important matter. Thereafter, Mr. Thomas filed his Motion to Withdraw on August 14, 2023. (ECF No. 67.) Any delays were caused by the schedule of the undersigned counsel, who

represent indigent clients in trial, appellate, and post-conviction proceedings throughout Maryland and in the District of Columbia. They were not caused by Mr. Thomas. Nor were they the result of strategic machinations about the potential sentence of a co-defendant.

And while it may be true that the Government has an interest in the finality of guilty pleas (ECF No. 70 at 52), it should also be true that the Government has in interest in making sure the rights guaranteed by the Fourth and Sixth Amendments are protected and vindicated.

## CONCLUSION

For the foregoing reasons and those stated in the Motion to Withdraw Guilty Plea, Mr. Thomas respectfully requests that this Honorable Court hold an evidentiary in this matter.

Respectfully submitted,

/s/

_____

Michael E. Lawlor
Adam C. Demetriou
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
301.474.0044
mlawlor@verizon.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 19, 2023, a copy of the foregoing was

sent to the United States Attorney's Office for the District of Columbia, via ECF.

/s/
_____

Michael E. Lawlor